## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Desmond Fielding,                                    Civil No. 21-1407 (DWF/DTS)

             Plaintiff,

v.                                                   **MEMORANDUM**
                                                     **OPINION AND ORDER**

Allina Health System,

             Defendant.

_____

Frederick L. Neff, Esq., Neff Law Firm, P.A., counsel for Plaintiff.

Hannah Camilleri Hughes, Esq., Holly M. Robbins, Esq., Minhquang Trang, Esq., Littler
Mendelson, counsel for Defendant.

_____

## INTRODUCTION

This matter is before the Court on Defendant Allina Health System's motion for

summary judgment.  (Doc. No. 86.)  Plaintiff Desmond Fielding opposes the motion.

(Doc. No. 122.)  For the reasons set forth below, the Court grants Allina's motion.

## BACKGROUND

Fielding began working for Allina in 2007 as a nursing assistant.  (Doc. No. 89-1

("Fielding Dep.") at 30-31.)  He was later promoted to Registered Nurse.  (*Id.* at 39-40.)

## I.      Performance Between July 2014 and September 2017

Allina reports that between July 2014 and September 2017, Fielding received ten

patient complaints.  (Doc. No. 115-1 at 3.)  Fielding met with Human Resources ("HR")

in January 2016, November 2016, and March 2017 to discuss complaints and receive

formal coaching.  (*Id.*)  Additionally, in September 2015, a nurse reported that Fielding

made her feel uncomfortable because he "eyes [her] up and down" and acted overly

familiar.  (Doc. No. 105 at 2.)  Allina spoke with two other nurses and a social worker

who had potentially witnessed interactions between Fielding and the nurse who made the

complaint.  (*Id.* at 3-4.)  Two people noted that they had witnessed these interactions and

saw how uncomfortable it made the reporting nurse feel.  (*Id.*)  One person did not

describe Fielding as overly familiar but stated that Fielding could be intimidating to

younger nurses.  (*Id.* at 3.)

Fielding also received positive feedback during this time.  He received several

Care on the Spot Awards, which are given to Allina employees who provide exceptional

care to patients.  (Doc. No. 124-1 at 2-12.)  His performance reviews in 2015 and 2017

were also positive, indicating that he was meeting or exceeding expectations in every

category.  (*Id.* at 13-25.)

In March 2017, Fielding made a complaint on the Integrity Line.  (Doc. No. 94-1

at 5.)  Fielding alleged that his supervisor, Deb Scott, was nit-picking and harassing him.

(*Id.*)  Fielding did not mention race, color, or national origin discrimination in this

complaint.  (*Id.*)  Instead, he complained that Scott did not need to go to HR and instead

could meet with him privately.  (*Id.*)  HR met with Fielding twice to discuss his concerns

and concluded that the allegations were unsubstantiated.  (Doc. No. 114-1 at 2.)

In July 2017, Fielding reported a negative interaction that he had with another

nurse, Kris Stiefenhofer.  (Doc. No. 90-1 at 10.)  Fielding told Scott that he asked Kris for

help with a sheath pull, and Kris told him that he could do it by himself.  (*Id.* at 5.)

Fielding "disagreed and then said Kris reacted and it started to escalate into a disagreement." (*Id.*) Scott and an HR Generalist, Nancy Gerber, spoke with several employees who witnessed the argument. (*Id.* at 4-5, 12.) Scott reported that Fielding and Kris spoke and "everything was now good between [them]." (*Id.* at 5.) During Fielding's deposition, he testified that Kris called him "boy" during their verbal altercation (Fielding Dep. at 57); however, Fielding did not mention this to Scott or HR.

In September 2017, Fielding received corrective action after he threatened to take a call light away from a patient. (Doc. No. 104-1 at 2.) During Fielding's shift, a staff member found the patient sitting in a chair without a call light within reach. (*Id.*) The patient also described Fielding as "rude and bossy." (*Id.*) Fielding denied ever threatening to take the call light away but acknowledged that he was not sure if the patient had a call light while the patient was in the chair. (*Id.*)

## II.     April 2018 Meeting with HR

Fielding met with HR in April 2018. (Doc. No. 115-1 at 6-7.) Fielding stated that people of color were not receiving Care on the Spot Awards. (*Id.*) HR followed up with Fielding and included data about Care on the Spot Awards and stated that ninety-three awards were submitted for employees on H5200 who identified as people of color between January 1, 2017, and May 10, 2018. (*Id.*)

## III.    November 2018 Meeting with HR

Fielding met with Scott and HR again at the end of November 2018 to discuss six new complaints that occurred in the fall of 2018. (Doc. No. 90-1 at 14.)

The first incident occurred on October 26. (*Id.* at 15.) A nurse gave a medication late. (*Id.*) Fielding asked the nurse to change the time for the next dose. (*Id.*) The nurse forgot to change the time and apologized to Fielding. (*Id.*) Fielding repeated that the nurse had made a mistake. (*Id.*) The nurse told Fielding that she did not like the way he spoke to her and described his tone as berating. (*Id.*)

The second incident occurred on November 2. (*Id.* at 14.) A patient's family reported that Fielding shook a sleeping patient and said, "Wake up and quit sleeping on the job." (*Id.*) The patient's wife also asked for water, and Fielding said, "There is a water fountain right outside. Or you can get some exercise and come follow me." (*Id.*)

The third incident occurred on November 11. (*Id.*) A charge nurse reported that a patient's bed alarm kept going off. (*Id.*) She went to check on the patient while Fielding continued to sit at his computer. (*Id.*) She also noted that during another shift she asked Fielding if he could answer his call light and he said, "No, that is the nursing assistant's job." (*Id.*)

The fourth incident occurred around the same time. (*Id.*) Fielding told a patient that a Licensed Practical Nurse ("LPN") "works for me." (*Id.* at 14-15.) The LPN also reported that Fielding frequently calls him a nursing assistant, rather than an LPN. (*Id.* at 15.)

The fifth incident occurred on November 17. (*Id.*) A nurse reported that Fielding asked her questions in an "interrogating fashion" in front of a patient. (*Id.*) She said that Fielding spoke to her in a way that was "harsh and intimidating," and she felt bad that the patient and their family had to witness the behavior. (*Id.*) When the nurse went back to

4

her desk, Fielding said to her, "You are a wife now, shouldn't you be at home in front of the stove making rice pilaf?"  (*Id.*)

The sixth incident occurred on November 29.  (*Id.*)  Fielding worked with a new nurse.  (*Id.*)  The new nurse made a mistake, and following her interaction with Fielding, the nurse was in tears in the break room.  (*Id.*)

During the meeting, Scott noted that Fielding needed to work on his relationships with other nurses, as well as his interactions with patients' families.  (*Id.* at 14.)  Scott stated that she and Fielding discussed ways for him to be more respectful and compassionate.  (*Id.* at 15.)

## IV.     December 2018 Corrective Action and Subsequent Harassment Allegation

On December 6, 2018, Fielding received corrective action based on the comment he made to a nurse that she should be in the kitchen because she is a wife.  (*Id.* at 17.) Fielding acknowledged that he said something like that but insisted that he was joking. (*Id.*)  The report notes that Fielding "was reminded that this comment is discriminatory and cannot be used as a joke in the workplace."  (*Id.*)  Fielding signed the corrective action.  (*Id.* at 18.)

Three days later, Fielding called the Integrity Line and reported that Scott kept bringing him to HR for unfounded reasons and waited for complaints to build up.  (Doc. No. 117-1 at 3.)  He also stated that Scott discriminated against him because he is an African American male.  (*Id.*)  He said that Scott told him he was "too direct" and expressed that she felt "intimidated" by him.  (*Id.*)

Fielding then submitted a letter to System Chief Nursing Officer and Vice

President of Care Mandy Richards about harassment and hostile work conditions. (Doc.

No. 116-1 at 8.) Fielding alleged that he was the only nurse that Scott had taken to HR

with complaints that are "resolvable at the Unit level." (*Id.*) He further noted that other

"African American nurses and other staff have encountered similar harassment." (*Id.*)

As an example, he stated that if African American nurses have a conflict with a class,

they are less likely to get their schedules changed. (*Id.* at 10.) He also alleged that

"African Americans are least recognized for their care[giving] efforts." (*Id.*) Finally, he

stated that he was repeatedly subjected to derogatory comments. (*Id.*)

## V.    February 2019 Patient Incident

In February 2019, Fielding emailed Scott and told her that a patient made several

derogatory statements towards him and people of color. (Doc. No. 90-2 at 22.) He said

that he had taken care of the patient before and the patient's behavior was ongoing. (*Id.*)

Scott was out of town at the time but emailed the Director of Nursing, Louise Jacobs, and

asked her to meet with the patient, along with the patient's doctor, to have a discussion

about the patient's discriminatory comments. (*Id.* at 21.) Scott told Jacobs to remind the

patient that this behavior is not tolerated at the hospital and if he did not stop, he would

have to seek care elsewhere. (*Id.*) That same day, Jacobs sent Fielding an email to let

him know that she and the doctor met with the patient and reviewed Allina's policy

regarding discrimination. (*Id.* at 24.) She also stated that she put a note in the patient's

record that the patient understood the policy and was aware of the consequences of not

following it. (*Id.*)

## VI.    March 2019 Harassment Allegation

On March 6, 2019, Fielding reported a negative interaction that he had with another nurse, Sandy Schum.  (*Id.* at 29-30.)  Fielding stated that Schum got mad at him for not answering his phone while he was driving.  (*Id.*)  He noted that this was just one of the many instances in which Schum was condescending towards him.  (*Id.*)  On March 14, 2019, an anonymous call was made to the Integrity Line relaying the same story.  (Doc. No. 117-1 at 18.)  Schum stated that she apologized to Fielding and he accepted her apology.  (Doc. No. 90-2 at 27.)  She also clarified that she told him to check his messages when he was parked, not while he was driving.  (*Id.* at 32.)  In Fielding's deposition, he said that during his conversation which Schum, she said, "You Blacks are so direct" and "You Blacks think you know everything" (Fielding Dep. at 87).  Fielding did not mention these comments in his email or in the Integrity Line complaint.

On March 15, 2019, Fielding emailed Jacobs and requested a meeting.  (Doc. No. 114-1 at 12.)  Jacobs asked Fielding to send his availability.  (*Id.*)  On April 1, 2019, Fielding emailed Jacobs and stated that "the hostile working conditions, harassment and condescending behaviors towards [him] on H5200 ha[d] intensified."  (*Id.* at 11.)  Fielding said that he "sensed some retaliation because [he] reported several people on H5200 for their negative treatment towards [him]."  (*Id.* at 12.)  Jacobs replied and let Fielding know that she and Leah Schmoyer, an HR generalist, could meet at the end of April.  (*Id.* at 11.)  On April 8, 2019, Jacobs sent Fielding another email, noting that the end of April no longer worked and asking Fielding to email dates in May that would work for him.  (*Id.*)  Fielding did not respond, so a month later Jacobs reached out to

Fielding again to let him know that her last day was May 10, 2019. (*Id.*) Fielding replied and stated that he believed he should wait and meet with the new director. (*Id.* at 10.) Jacobs told Fielding that the interim director was Scott. (*Id.*)

## VII.   March 2019 Corrective Action

On March 22, 2019, Fielding received corrective action for six incidents that occurred between January and March 2019. (Doc. No. 90-2 at 17.)

The first incident occurred on January 1. (*Id.*) A patient, a sixty-six-year-old African American woman, contacted a manager and said that Fielding provided her with too much information, which she described as overwhelming. (*Id.*) The patient also wanted reassurance, which Fielding did not give her. (*Id.*) Moreover, she asked for a toothbrush and Fielding put down the previous nurse for not getting one. (*Id.*) Fielding also called the attending doctor and told the patient that the doctor had said not to call him at home. (*Id.*) The patient did not believe this information should have been shared with her. (*Id.*) Overall, the patient believed that Fielding "talked more about what was wrong rather than focus[ing] on what was going right." (*Id.*) When HR told Fielding about this patient, he denied the allegations and said that he "f[ound] it very unusual for [him] to have treated an African American patient in this manner." (*Id.*)

The second incident occurred on February 4. (*Id.*) Someone reported on the Integrity Line that Fielding described a nurse as "the one who wears tight outfits." (*Id.*) Fielding denied making the statement. (*Id.*) Another report stated that Fielding was showing pictures of his son without his shirt on. (*Id.*) An employee confirmed this, but Fielding asserted that his son had a shirt on in the picture. (*Id.*)

The third incident occurred on February 19.  (*Id.*)  An Integrity Line complaint and staff report stated that Fielding asked a lab tech who was looking on his phone if he was "watching dirty movies."  (*Id.*)  Fielding denied making the statement and reported that he believed a nurse named Megan called the Integrity Line because she "always sits up at the front desk with her big ears listening to everyone."  (*Id.*)

The fourth incident occurred on February 25.  (*Id.*)  A charge nurse reported that Fielding saw a patient's name and assumed that the patient was from Somalia.  (*Id.*)  He said that Somalian women do not like men caring for them.  (*Id.*)  The charge nurse informed Fielding that the patient was not from Somalia.  (*Id.*)  The bedside nurse suggested that Fielding meet with the patient "before making any assumptions about the care."  (*Id.* at 18.)  The bedside nurse said that Fielding began telling the patient about his experience with Somalian women before he introduced himself.  (*Id.*)  The patient's son then stated that it did not matter to the patient that Fielding was a male nurse and that they were from Ethiopia, not Somalia.  (*Id.*)

The fifth incident occurred on February 26.  (*Id.*)  An employee called the Integrity Line and reported that when a coworker said she was going home sick, Fielding jokingly asked if the coworker went home because of mental problems.  (*Id.*)  Fielding denied making that comment.  (*Id.*)

The sixth incident occurred on March 2.  (*Id.*)  A patient told Fielding that she was having a severe headache.  (*Id.*)  Fielding offered to give her Tylenol, but she said the pain was too severe for Tylenol.  (*Id.*)  She said that Fielding appeared to have no other options for her.  (*Id.*)  After the patient spoke with her husband, she called Fielding again

and told him to call the Rapid Response Team.  (*Id.*)  The Rapid Response Team gave the patient other pain medication, and the patient felt relief.  (*Id.*)  Fielding reported that he called the Rapid Response Team on his own volition and not because the patient asked him to.  (*Id.*)

As part of the corrective action, Fielding was directed to avoid generalizations and stereotyping, avoid inappropriate jokes, keep patients informed of what is happening and what Fielding is doing, and speak positively of coworkers to other patients.  (*Id.*) Fielding refused to sign the corrective action.  (*Id.* at 19.)

## VIII.  July 2019 Corrective Action and Harassment Allegation

On July 25, 2019, Fielding received a final written warning for two incidents. (Doc. No. 104-1 at 18.)  The first occurred on July 11, 2019.  (*Id.* at 16.)  Fielding wrote a patient assessment in the patient's chart before observing the patient.  (*Id.*)  Fielding stated that this was normal practice for him and said he would have modified the note if needed.  (*Id.* at 17.)  Nurse Supervisor, Kathryn Haugen, explained to Fielding that this was not an acceptable practice and noted that he put "the patient and others at risk by documenting on a patient he had not seen."  (*Id.*)  Fielding received the same coaching in July 2018.  (*Id.*)  The Allina System-Wide Nursing Documentation Standard requires that the "time and date of each entry . . . must be accurately documented."  (*Id.*)

The second incident occurred on June 8, 2019.  (*Id.*)  An LPN reported that he tried to speak with Fielding multiple times about his patients, but Fielding would not acknowledge him.  (*Id.*)  The LPN stated that he had to communicate with Fielding through another nurse.  (*Id.*)  Two witnesses corroborated the LPN's report.  (*Id.*)  During

Fielding's interview, he accused the LPN of retaliating against him and alleged that the two witnesses were lying. (*Id.*) The report concluded that Fielding was not credible "because he changed his statement throughout the interview, two witnesses supported [the LPN's] description of the incident, and the Vocera report does not support [Fielding]'s account of the incident." (*Id.* at 18.)

As part of the final written warning, Fielding was to work on communicating with other staff in a more clear and respectful manner, follow up with the LPN about Fielding's request for mediation, and document patient care plans only after assessing patients. (*Id.*) Fielding did not sign the corrective action. (*Id.*) Instead, Fielding alleged that he was being harassed by Haugen and an HR Generalist, Josine Durant. (*Id.*) He further alleged that he was experiencing "lateral violence" based on his age, gender, and color. (*Id.*) The corrective action noted that Fielding "did not explain why he believes this corrective action to be 'harassment' or 'lateral violence.'" (*Id.*)

## IX.    Allina Investigation

Allina investigated the complaints Fielding had made in December 2018 and July 2019. (Doc. No. 116-2 at 11-12.) The investigation report noted that Fielding "has been unwilling to meet with HR or Employee Relations to discuss his concerns, [so] the hospital has proceeded with the investigation based on the information he has provided." (*Id.* at 17.) The report responded to each of Fielding's allegations. (*Id.* at 17-19.) The report noted that scheduling flexibility depends on the type of schedule an employee works. (*Id.*) Those on block rotations, like Fielding, "are not allowed to ask off for the one day per week that others do"; however, "co-workers who are not on the block

11

schedule do self-scheduling, so they pick their shifts around their other commitments." (*Id.* at 17.)  Allina also evaluated its ESpots awards for 2018 and found that people who self-identified as Black/African American worked 7% of the hours and were awarded 7% of the awards.  (*Id.* at 18.)  And lastly, the report noted one occasion in which a patient made derogatory comments about Fielding.  (*Id.* at 18-19.)  The incident was addressed. (*Id.*)  The report concluded by stating that since Fielding received a corrective action in 2017, he "has become difficult to work with and has received multiple complaints from co-workers, patients, and patient families.  Mr. Fielding's complaints of being treated unfairly based on his age, gender and race [are] a direct result of being held accountable for poor performance and unacceptable behavior."  (*Id.* at 19.)

## X.    January 2020 Corrective Action and Termination

On the morning of December 27, 2019, Fielding was assigned to care for a patient with end-stage esophageal cancer.  (Doc. No. 90-2 at 36.)  The patient had a gastrostomy tube (G-tube).  (*Id.*)  The prior day, the patient reported that he was experiencing nausea and vomiting after feedings.  (Doc. No. 95 ("Cudak Decl.") ¶ 5.)  The resident physician consulted with a dietician and GI Physician Assistant and "adopted the dietician's recommendation to switch the patient from bolus feeds to pump feedings."  (*Id.*)  The resident physician advised Dr. Mendon, the attending physician, and he approved.  (*Id.*) At 8:12 p.m. on December 26, the resident physician submitted an order to switch the patient to pump feedings.  (*Id.*)

When Fielding's shift ended the following evening, Fielding mentioned to the new nurse, Kendyl Folska, that the patient vomited when he was fed by syringe.  (Doc.

12

No. 107 ("Folska Decl.") ¶ 12; Fielding Dep. at 271.)  Folska asked why Feilding had fed the patient via syringe when the doctor's order said to feed by pump.  (Folska Decl. ¶ 12.) Folska reported that Fielding said that the amount of food was small, so he did not want to waste his time setting up a pump.  (*Id.*)  Folska also reported that the patient was upset and asked Folska why the previous nurse did not use the pump.  (*Id.* ¶ 13.)  The patient told Folska that he informed Fielding that the doctor and dietitian had ordered a pump, but Fielding did not listen.  (*Id.*)

Haugen and Durant met with Fielding on January 9, 2020.  According to Durant, Fielding said that the patient did not want to use the pump, so he followed the patient's direction.  (Doc. No. 104-2 at 2.)  Haugen also called the patient after his discharge. (Doc. No. 106-1 at 11.)  The patient told Haugen the following:

> There was a hell of an issue.  I had [a] bigger black dude.  He gave me my first feeding in tube and I told him I cannot do bolus because I puke.  He persisted on arguing with me.  He said, 'This is the way I always do it.' Then I said, 'Well nothing I can do about that.'  And ended up puking.  The next nurse came in and said I got the bags and pump and should be here soon.  I said how come the other nurse didn't do that.  The nurse said, 'I have no idea it's in your notes.'

(*Id.*)

On January 16, 2020, Fielding's employment was terminated.  (Doc. No. 104-2 at 7.)  The corrective action noted that Fielding "did not listen to the patient, his documentation was incomplete, and he did not follow the stated doctor's orders."  (*Id.*) The report further noted that Allina was "also unable to find any documentation to support [Fielding]'s statements regarding the patient situation" and concluded that Fielding "was not truthful during the investigatory meeting."  (*Id.*)  At his deposition,

Fielding testified that he was following Allina protocol, which he asserts requires bolus feeding for G-tubes.  (Fielding Dep. at 281-82.)

## XI.   Procedural Posture

On July 8, 2019—prior to Fielding's termination—Fielding filed a charge with the EEOC and Minneapolis Department of Civil Rights ("MDCR").  (Doc. No. 89-1 at 518.)  The EEOC transferred Fielding's charge to the MDCR.  (*Id.* at 519.)  Fielding alleges that he filed an amended charge in November 2020 (Doc. No. 125 at 1); however, the amended charge is not in the record and the MDCR's notice of determination refers to only the July 8, 2019 charge.  (Doc. No. 89-2 at 107.)

On March 16, 2021, the MDCR concluded that no probable cause for discrimination existed.  (*Id.* at 106.)  The EEOC then issued Fielding a notice of right to sue.  (*Id.* at 143.)  On June 15, 2021, Fielding filed this lawsuit against Allina.  (Doc. No. 1.)  Fielding later filed an amended complaint, alleging race, color, and national origin discrimination under Title VII and the Minnesota Human Rights Act ("MHRA") and race discrimination under Section 1981.  (Doc. No. 10.)

Allina now moves for summary judgment on the entirety of Fielding's amended complaint.  (Doc. No. 86.)  Fielding opposes the motion.  (Doc. No. 122.)

## DISCUSSION

## I.   Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party opposing a motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.  "Conclusory arguments, without evidence, are insufficient as a matter of law to establish a material question of fact." *Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1013, 1019 (8th Cir. 2017).  The Court views the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).

## II.    Last-Minute Submissions

At the summary judgment hearing, Fielding's counsel requested permission to file four additional exhibits in support of his opposition to Allina's motion for summary judgment.[1]  The first exhibit is a declaration by Fielding.  Fielding asserts that Allina has failed to provide numerous emails in discovery.  The second is a declaration by Steve Xiong, who describes his experience with the Minnesota Department of Human Rights ("MDHR").  The third is an email from the Minnesota Nurses Association (the "Union"), with a copy of Allina's response to Fielding's grievance.  The fourth is a June 2017 article on esophageal cancer, written by the American Cancer Society.

---

[1]    The Court directed Fielding to electronically file these documents for the Court to consider, and Fielding did not do so.  The Court is therefore relying on hard copies provided at the hearing.

These documents could have been included when Fielding filed his opposition memorandum in April 2023. In fact, a copy of Allina's response to Fielding's grievance is already in the record. (*See* Doc. No. 127.) Fielding's request to refile this document is denied, and the Court will rely solely on what is in the record.

The three remaining documents that Fielding seeks to file are not in the record, and the Court will not consider them. Discovery concluded in December 2022. (Doc. No. 30.) If Fielding believed that Allina had not provided relevant emails, he could have raised that issue at that time. The parties spent months litigating discovery issues, yet this issue was never raised. Similarly, Fielding could have included the 2017 article when he filed his opposition memorandum. Lastly, the Xiong declaration is entirely irrelevant to this case. Xiong is not a party to, or affiliated in any way with, the case. Nor does he appear to have any knowledge about this case. While Xiong received information from the MDHR about his unrelated charge of discrimination, Fielding never filed a charge with the MDHR. Thus, information about someone else's experience with the MDHR is irrelevant, not to mention untimely.

Fielding's request to file these additional documents is denied. [2]

---

[2]     However, even if the Court had considered these documents, the Court's decision would be the same.

### III.    MHRA Claims

Fielding brings three claims under the MHRA, alleging race, national origin, and color discrimination.  *See* Minn. Stat. § 363A.08.  Allina argues that these claims are untimely and should be dismissed.

Fielding filed his charge of discrimination with the EEOC and the MDCR.  (Doc. No. 89-1 at 518-19.)  Under Minnesota law, once the MDCR commissioner "has determined that there is no probable cause" and issues a dismissal, the claimant must bring a civil action within 45 days of receiving the notice.  Minn. Stat. § 363A.33, subd. 1.  Receipt of the notice is presumed five days from the date of service by mail.  *Id.*  To file a complaint outside the filing window, Fielding must offer evidence that "circumstances beyond [his] control prevented [him] from serving the complaint within the statutory period."  *Chappell v. Butterfield-Odin Sch. Dist. No. 836*, 673 F. Supp. 2d 818, 833 (D. Minn. 2009).

In this case, the MDCR issued a no-probable-cause determination on March 18, 2021, informing him that "the Department concludes that **No Probable Cause** exists to believe the allegations of discrimination are well-founded."  (Doc. No. 123-7 at 3 (emphasis in original).)  Receipt of the notice may be presumed five days afterwards, on March 23.  Fielding filed his Complaint on June 15 and served Allina with the Complaint on July 21, after the 45-day window had lapsed.  (Doc. No. 4.)  Moreover, Fielding has failed to present evidence that "circumstances beyond [his] control prevented [him] from serving the complaint within the statutory period."  *Chappell*, 673 F. Supp. 2d at 833.  Thus, Fielding's MHRA claims are time-barred.  *See Coleman v. Mpls. Pub. Sch.*

*SSD #1*, No. 15-cv-4419, 2016 WL 4708495, at *5 (D. Minn. 2016) (dismissing the plaintiff's MHRA claim when the plaintiff's charge with the EEOC was cross-filed with the MDHR, and the plaintiff failed to file and serve his complaint within the forty-five day right-to-sue window).[3]

## IV.    Title VII Claims

Fielding claims that he was discriminated and retaliated against based on his race, color, and national origin and that Allina created a hostile work environment in violation of Title VII.

As an initial matter, Allina argues that Fielding failed to exhaust his administrative remedies.  Specifically, Allina contends that Fielding filed the action before his termination and did not amend his charge to include his termination.  Additionally, Fielding failed to check the box for retaliation in his charge.  Therefore, Allina asserts that Fielding has failed to exhaust his administrative remedies for his retaliation claims and claims related to his termination.

In order to pursue a Title VII claim, a plaintiff must exhaust his administrative remedies and to do so a plaintiff's charge must "be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim."

*Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 697 (8th Cir. 2009) (internal

---

[3]    Even if Fielding's claims were timely under the MHRA, they would fail as a matter of law for the same reasons as his Title VII discrimination claims fail.  *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) ("The same analysis applies to both MHRA and Title VII claims.").

quotations and citation omitted).  Administrative complaints are interpreted liberally. *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988).  "The allegations in a subsequently filed lawsuit must relate to the same conduct and individuals as charged with the EEOC; put another way, the civil claim must grow out of or be reasonably related to the administrative charge."  *Catlin v. Wal-Mart Stores, Inc.*, 123 F. Supp. 3d 1123, 1133 (D. Minn. 2015) (internal quotations and citation omitted).

The Court agrees with Allina that it does not appear that Fielding amended his charge, despite his assertion otherwise.  As noted above, the amended charge is not in the record and the final notice of determination noted only the initial July 2019 charge. (Doc. No. 89-2 at 107.)  That said, the MDCR considered Fielding's termination, as Fielding alleged "continuous instances of discrimination" and provided evidence of his termination in his Rebuttal and exhibits.  (*Id.*)  Moreover, Allina provided the MDCR with evidence related to Fielding's termination, and therefore Allina was clearly on notice of the full extent of Fielding's discrimination claim.

Whether Fielding exhausted his administrative remedies related to his retaliation claims is a more difficult question.  As Allina notes, Fielding did not check the box for retaliation in his initial charge.  Moreover, the MDCR did not analyze a retaliation claim in its determination.  The MDCR did, however, conclude that Fielding failed to establish a prima facia case for "discrimination *and retaliation*."  (Doc. No. 89-2 at 115 (emphasis added).)  The Court attributes this to a scrivener's error as the MDCR's determination only analyzed Fielding's discrimination claim and clarified that Fielding "alleged [Allina] discriminated against him based on race, age, and sex."  (*Id.* at 107.)  The Court therefore

concludes that Fielding has failed to exhaust administrative remedies for his retaliation claims.[4]

## A.     Discrimination

Fielding alleges that he was discriminated against based on his race, color, and national origin in violation of Title VII.[5]  Title VII prohibits discrimination in employment based on race, sex, and national origin.  *Torgerson*, 643 F.3d at 1045.  "A Title VII plaintiff can survive summary judgment either by (1) presenting direct evidence of discrimination, or (2) creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext."  *Banford v Bd. of Regents of Univ. of Minn.*, 43 F.4th 896, 899 (8th Cir. 2022) (internal quotations and citation omitted).  Fielding alleges that the record contains both direct and indirect evidence of discrimination.

---

[4]     Although Fielding argues that Allina's affirmative defense is untimely, Allina stated in its Answer that Fielding's claims were "barred . . . by his failure to comply with the jurisdictional, procedural, and *administrative* prerequisites for filing this action." (Doc. No. 11 at 24 (emphasis added).)

[5]     As an initial matter, Plaintiff's brief, which was submitted by counsel, fails to cite to "particular parts of materials in the record," as required by Rule 56 of the Federal Rules of Civil Procedure.  Instead, counsel cites to entire documents, some of which are hundreds of pages long.  And a large portion of the briefing contains no citations at all. "District Judges are not archaeologists.  They need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the burden on the litigants, but also because their time is scarce."  *Nw. Nat. Ins. Co. v. Baltes*, 15 F.3d 660, 662-63 (7th Cir. 1994).

### 1.    Direct Discrimination

Direct evidence is evidence "showing a specific link between the alleged

discriminatory animus and the challenged decision, sufficient to support a finding by a

reasonable fact finder that an illegitimate criterion actually motivated the adverse

employment action." *Torgerson*, 643 F.3d at 1044 (internal quotations and citation

omitted).  Direct evidence does not include "stray remarks in the workplace, statements

by nondecisionmakers, or statements by decisionmakers unrelated to the decisional

process." *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 699 (8th Cir. 2003) (internal

quotations and citation omitted).  But "[c]omments which demonstrate a discriminatory

animus in the decisional process . . . or those uttered by individuals closely involved in

employment decisions may constitute direct evidence." *Beshears v. Asbill*, 930 F.2d

1348, 1354 (8th Cir. 1991) (internal quotations and citation omitted).

Fielding first alleges that Allina personnel claimed that Fielding "was a

threatening presence in the workplace."  (Doc. No. 122 at 18.)  Fielding cites to

"Exhibit P," but the Court was unable to find the exhibit in the record.  At this stage of

the proceedings, Fielding must support his assertions with materials in the record.  *See*

Fed. R. Civ. P. 56(c)(1)(A).  Moreover, Fielding does not explain who specifically made

the statement, whether they were decisionmakers at Allina, or when the statement was

made.  Nor does Fielding explain how this statement demonstrates discriminatory animus

based on race, color, or national origin.

Fielding next asserts that Allina "discriminatorily want[ed] to get Fielding out of

the workplace."  (Doc. No. 122 at 18.)  Fielding cites to an email chain between various

employees at Allina that occurred in April 2019.  (Doc. No. 123-10 at 2.)  In the email, Jacobs states that Scott was "afraid at this point of [Fielding] potentially causing harm to her."  (*Id.*)  Jacobs went on to say that she was worried about Scott and asked the others, "How do we protect our leaders in these situations.  Can we move [Fielding] out of Allina Health?  I am sure the answer is no, but we have to do something to protect [Scott]."  (*Id.*)  Fielding argues that these emails provide direct evidence of a discriminatory motive.

"Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker."  *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006).  In these emails, Jacobs explained that she was worried about Scott because Fielding "blames [Scott] for everything," "has withdrawn from interacting with his peers," and "makes no eye contact" and will not acknowledge Scott.  (Doc. No. 122 at 18.)  The statements are neutral, as nothing in the email is directed towards Fielding's race, color, or national origin.  *See Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (concluding that statements that the plaintiff was not "humble enough" or "too prideful" were facially race-neutral).

Fielding also asserts that he was called the n-word, "boy," and "big black dude." (Doc. No. 122 at 19.)  In his briefing, Fielding fails to provide a single example of when these derogatory statements about him were made and by whom.  Instead, Fielding argues more generally that he was subjected to these statements by "co-workers and patients."  (*Id.* at 17; *see also id.* at 19, 24, 25, 37.)  Upon review of Fielding's deposition, the Court found several examples of incidents in which Fielding alleges that derogatory

statements were made about him. These statements can be broken into three categories: (1) statements made by coworkers; (2) statements made by patients; and (3) statements made by Scott and Haugen.

### i.    Statements by coworkers

Fielding asserts that other nurses made derogatory comments about him. He alleges that Brad Bjornson called him the n-word sometime between 2019 and 2020, and Kim Isenhower called him the n-word and "you Blacks" on several occasions. (Fielding Dep. at 55-56, 75-76.) There is no evidence that Fielding reported these incidents to his supervisor or HR. It is also undisputed that Bjornson and Isenhower were not decisionmakers, meaning they were not involved in the decision to terminate Fielding's employment. *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 878 (8th Cir. 2010) ("[S]tatements by nondecisionmakers" are not direct evidence). Fielding also testified that Sandy Schum said, "You Blacks are so direct" (Fielding Dep. at 87), and Kris Stiefenhofer called him "boy." (*Id.* at 92). While Fielding did report Schum and Stiefenhofer to HR, he did not mention any derogatory statements. (*See* Doc. No. 90-2 at 29-30; Doc. No. 90-1 at 10.) And again, neither Schum nor Stiefenhofer were involved in the decision to terminate Fielding's employment. Thus, these statements do not constitute direct evidence of discrimination.

### ii.    Statements by patients

Second, Fielding alleges that other patients made derogatory comments about him. While Fielding's claim that Allina failed to handle these incidents or protect him from discrimination may serve as indirect evidence of discrimination—and therefore will be

discussed below—these comments do not constitute direct evidence of discrimination because the patients were not decisionmakers.  *See Elam*, 601 F.3d at 878.

>           iii.   *Statements by Scott and Haugen*

Fielding also asserts that Scott and Haugen made derogatory comments about him. He alleges that Scott told him she had a Black maid growing up.  (Fielding Dep. at 82.) He also alleges that Scott said to him, "What do you Blacks do with all your money," "You Blacks are too direct," and "You Blacks . . . always want to get the last word in." (*Id.*)  He said that if he ever went to Scott about anything, "it always ended with 'you Blacks.'"  (*Id.* at 83.)

A statement constitutes direct evidence of discrimination when a factfinder could "find that the [discriminatory] attitude was more likely than not a motivating factor in the employer's decision."  *Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 634 (8th Cir. 1998) (internal quotation and citation omitted).  "Absent a causal link between the racial comments and the adverse employment decision, [the defendant]'s derogatory language is best classified as statements by a decisionmaker unrelated to the decisional process."  *Simmons v. Oce-USA, Inc.*, 174 F.3d 913, 916 (8th Cir. 1999) (cleaned up).

Fielding has failed to demonstrate a causal link between Scott's statements and Fielding's termination.  When pressed about these statements during his deposition, Fielding was unable to say when or how often Scott made these statements or provide additional details, such as where he was when Scott made the comments or whether anyone may have overheard.  There is also no documentation to support Fielding's

testimony.  Fielding complained on multiple occasions about discrimination and harassment in the workplace but never mentioned these comments.  There is no evidence that Fielding mentioned these statements at the time of his termination, and Scott was never asked about these comments during her deposition.  Rather, she was asked whether she "ever heard" Fielding referred to as "you Blacks," to which she responded, "I never heard that."  (Doc. No. 89-1 ("Scott Dep.") at 278.)  Because there is no evidence of when or how often Scott allegedly made these comments, Fielding has failed to provide a "specific link" between the statements and the decision to terminate his employment.  *Putman*, 348 F.3d at 735.

Fielding also alleges that Haugen said, "[Y]ou Blacks think you know everything."  (Fielding Dep. at 86.)  Again, Fielding was unable to say when this statement was made, and he never mentioned this comment when he complained about discrimination and harassment in the workplace.  Nor did he mention this statement at the time of his termination, and Haugen was never asked about the comment in her deposition.  At this stage of the proceedings, Fielding "must substantiate allegations with sufficient probative evidence that would permit a finding in [his] favor."  *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005).  Aside from Fielding's assertion that Haugen made this statement at some point during his employment, there is nothing in the record connecting the statement to the decision to terminate Fielding.  Thus, the statement does not rise to the level of direct evidence of discrimination.

Lastly, when Haugen called a patient to talk about his recent experience at the hospital, the patient said, "I had [a] bigger Black dude" taking care of me.[6]  (Doc. No. 106-1 at 11.)  Haugen repeated that comment to Fielding and the comment was written in the corrective action document.  (Doc. No. 89-1 ("Haugen Dep.") at 220; Doc. No. 104-2 at 7.)  Fielding asserts that Haugen kept unnecessarily repeating the statement. (*See* Fielding Dep. at 276.)  While Fielding may argue that Haugen should not have repeated the patient's comment, "a single comment that merely references [race] is not sufficient to create a genuine issue of material fact of [race] discrimination."  *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 720 (8th Cir. 2008).

Fielding presents several other unsubstantiated claims that similarly do not amount to direct evidence of discrimination.  For example, he alleges that he had excellent performance reviews prior to 2017.  (*See* Doc. No. 122 at 22.)  This is not direct evidence of discrimination.  Additionally, in a last-minute declaration filed a year after his deposition, Fielding asserts that Scott told him not to put derogatory statements in writing, which he claims is why he did not report many of the derogatory comments that Allina employees made towards him.  In contrast, in Fielding's deposition, he stated that he "utilized the entire chain of command to report, you know, the [n-word]-calling, 'you Blacks,' 'Africa.'  I used the entire chain."  (Fielding Dep. at 166-67.)  Because the claim in Fielding's declaration conflicts with his deposition testimony, the Court will not

---

[6]   During Fielding's deposition, he alleged that the exhibit had been "modified," and the patient instead called him a "big Black dude."  (Fielding Dep. at 274-77.)  But there is no evidence that the document was altered.

consider it.  *See United Mine Workers of Am. v. Am. Com. Lines Transp. Servs., LLC*, No. 08-cv-1777, 2010 WL 3721544, at *2 (E.D. Mo. Sept. 15, 2010) ("It is well-established in the Eighth Circuit that an affidavit filed in opposition to a summary judgment motion that directly contradicts earlier deposition testimony is insufficient to create a genuine issue of material fact.").  Overall, Fielding has failed to provide any direct evidence of race, color, or national origin discrimination.

### 2.    Indirect Discrimination

"[I]f the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Torgerson*, 643 F.3d at 1044.  Fielding must show the following:  "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination."  *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011).  If a prima facia case is established, then Allina "must articulate a legitimate, non-discriminatory reason for the allegedly discriminatory action." *Tuttle v. Henry J. Kaiser Co.*, 921 F.2d 183, 186 (8th Cir. 1990).  If Allina meets that burden, then Fielding must show that "the articulated reason is mere pretext for a discriminatory motive." *Id.*

There is no dispute that Fielding is a member of a protected class, and thus the first element is satisfied.  Fielding also suffered an adverse employment action, as Allina terminated his employment.

Next, Fielding must demonstrate that he was meeting Allina's legitimate expectations at the time he was terminated.  Fielding asserts that he was meeting Allina's expectations because he received positive performance reviews between 2015 and 2017 and received numerous Care on the Spot Awards.[7]  Fielding received his most recent Care on the Spot Award in October 2018.  (Doc. No. 124-1 at 2.)

While Fielding received positive feedback during his employment with Allina, he cannot rely on past positive performance to prove that he was meeting Allina's expectations at the time he was terminated.  *Miller v. Citizens Sec. Grp., Inc.*, 116 F.3d 343, 346 (8th Cir. 1997) (holding three satisfactory evaluations were "not evidence that [the plaintiff] was meeting [the employer's] legitimate expectations when [the employer] fired him because they are too far removed in time from the date of [the plaintiff's] discharge").  Fielding received corrective action in December 2018, March 2019, July 2019, and January 2020, which all occurred *after* Fielding's positive performance reviews and most recent Care on the Spot Award.  And while Fielding disputes the bases for the corrective action, he has failed to put forth sufficient evidence to refute the numerous complaints against him, the majority of which were corroborated by other coworkers and patients.  The Court therefore concludes that Fielding has not demonstrated that he was meeting Allina's legitimate expectations at the time he was terminated.

---

[7]      Fielding also asserts that he was "put up to be a candidate for Nurse of the year" and cites to exhibit F in support; however, exhibit F does not have information about the Nurse of the year nomination.  (*See* Doc. No. 124-1.)

Fielding also must prove that the circumstances give rise to an inference of discrimination.  One way Fielding can establish an inference of discrimination is "by showing more-favorable treatment of similarly-situated employees who are not in the protected class."  *Guimareaes v. SuperValu, Inc.*, 674 F.3d 962, 974 (8th Cir. 2012) (internal quotations and citation omitted).  "The individuals used as comparators must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003) (internal quotation and citation omitted).

Fielding alleges the following:  "he was treated differently and worse than White RN[s] by management [at Allina]," he was not given the opportunity to act as a charge nurse, and he was treated differently than other coworkers because he was not given a performance review in 2018 or 2019.  (Doc. No. 122 at 26-27, 34.)  But Fielding fails to provide "any specific examples of employees, similarly situated in all relevant respects, who received more favorable treatment."  *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 876 (8th Cir. 2007); *see Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001) ("The test for whether employees are similarly situated to warrant a comparison to the plaintiff is 'rigorous.'").  Blanket assertions that he was treated worse than his coworkers are not enough to establish an inference of discrimination.

Another way Fielding can demonstrate an inference of discrimination is "by showing pretext with evidence that an employer failed to follow its own policies or shifted its explanation of the employment decision."  *Grant v. City of Blytheville*, 841

29

F.3d 767, 774 (8th Cir. 2016) (internal quotations and citation omitted).  Fielding puts

forth several examples of how Allina failed to follow its own policies.

Fielding argues that he did not receive a performance review between 2017 and

2020, "which was contrary to Allina policy."  (Doc. No. 122 at 34.)  Fielding fails to cite

to a specific policy that he believes was violated.  The record reflects that Fielding

received a performance review in 2015 and 2017.  (Doc. No. 124-1 at 13-25.)

Additionally, Fielding asserts that he "did not receive multiple chances and discipline

decisions were not made after investigations and consideration of applicable policy."

(Doc. No. 122 at 35.)  Again, Fielding fails to explain what policy he believes was not

considered.

Fielding also alleges that Allina failed to address discrimination by patients, in

violation of Allina's policies.  The Court has found only one instance in which Fielding

reported to his supervisor or HR that a patient made discriminatory statements.  In

February 2019, Fielding emailed Scott to let her know that a patient made derogatory

comments about him and people of color.  Scott emailed Jacobs and asked her to meet

with the patient, along with the patient's doctor, to discuss what the patient said to

Fielding.  That day, Jacobs sent Fielding an email to let him know that she and the doctor

met with the patient and reviewed Allina's policy regarding discrimination.

Fielding does not explain why he believes that Scott and Jacobs's handling of the

situation violated Allina's policies, and he does not provide any other instance where he

reported discrimination by patients to his supervisor or HR.  While he asserts that he

should have never been assigned to care for a patient known to have engaged in

discriminatory behavior, Allina's Patient's Who Engage in Discriminatory Behavior Policy states that "[c]hanges in employee staff will not be made except where the employee expresses a preference not to care for the patient based on the patient's discriminatory behavior." (Doc. No. 112-1 at 3.) There is no evidence that Fielding expressed a preference to not care for the patient prior to being assigned to the patient.

Overall, the Court concludes that Fielding has failed to establish a prima facie case of discrimination based on race, color, or national origin. Even if he had, Allina has provided a legitimate, non-discriminatory reason for Fielding's termination. Fielding received a significant number of complaints between 2018 and 2020. These complaints came from a multitude of people, including nurses, other staff, and patients. Most of these complaints were corroborated by others, including the final complaint that resulted in Fielding's termination. That complaint involved Fielding's failure to feed a patient by pump. The resident doctor who cared for the patient that day stated that he "submitted an order to switch the patient from syringe feedings to G-tube feedings with a pump" and the attending doctor stated that he approved the plan. (Cudak Decl. ¶ 5; Doc. No. 98 ("Mendon Decl.") ¶ 6.) During the shift-change the next day, a nurse testified that Fielding admitted he did not follow the order and said he did not want to waste time setting up the pump. (Folska Decl. ¶ 12.) The patient reported that he told Fielding he could not do bolus feedings, but Fielding responded, "This is the way I always do it." (106-1 at 11.) Allina met with Fielding to discuss the allegations. When asked why he did not follow the order, Fielding said that the patient told him he wanted bolus feedings. (Doc. No. 104-2 at 6-7.) Allina concluded that Fielding "did not follow procedure or

meet expectations for patient care because he did not listen to the patient, his documentation was incomplete, and he did not follow the stated doctor's orders.  (*Id.*)

While Fielding disagrees with Allina's conclusion, "[t]he critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861-62 (8th Cir. 2009).  Other than disagreeing with Allina's ultimate conclusion and disputing the prior complaints, Fielding has failed to demonstrate that Allina's reason for terminating him was pretextual.  For those reasons, Fielding's race, color, and national origin discrimination claims fail as a matter of law.

**B.    Retaliation**

As noted above, Fielding failed to exhaust administrative remedies for his retaliation claims, and thus the Court will dismiss those claims for that reason.  But even if Fielding had exhausted his administrative remedies, his retaliation claims would still fail as Fielding has not demonstrated a prima facie case of retaliation.

To establish a prima facie case of retaliation, Fielding must show the following: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.  *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005).

Fielding engaged in protected activity in December 2018 and July 2019, when he alleged that he and other African American nurses were subjected to harassment and

when he reported experiencing "lateral violence" based on his age, gender, and color. Additionally, Fielding suffered an adverse employment action when he was terminated.[8]

Fielding must also demonstrate a causal link between his complaints and his termination. "A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive." *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005). In this case, Fielding engaged in protected activity most recently in July 2019, and he was terminated in January 2020, nearly six months later. This extended delay weakens any alleged causal connection. *See Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (concluding that a two-month interval between the complaint and termination "dilutes any inference of causation").

Additionally, the record reflects that Fielding often engaged in protected activity *after* receiving corrective action. For example, Fielding received corrective action on December 6, 2018. (Doc. No. 90-1 at 17.) Six days later, Fielding wrote a letter to Mandy Richards, alleging that he and other African American nurses were experiencing harassment and hostile working conditions. (Doc. No. 116-1 at 8.) Then on March 22, 2019, Fielding received corrective action again. (Doc. No. 90-2 at 17.) Ten days later, Fielding emailed Jacobs and stated that "the hostile working conditions, harassment and

---

[8]     Fielding additionally argues that "pretextual corrective actions" constituted adverse employment action (Doc. No. 122 at 26); however, Fielding has not demonstrated that the corrective actions amounted to a "material employment disadvantage," such as "cuts in pay or benefits." *Jones v. City of St. Louis*, 825 F.3d 476, 480 (8th Cir. 2016).

condescending behaviors towards [him] on H5200 ha[d] intensified." (Doc. No. 114-1 at 11.) On July 25, 2019, Fielding received a final written warning for two incidents. (Doc. No. 104-1 at 16.) During that meeting, Fielding alleged that he was experiencing "lateral violence" based on his age, gender, and color. (*Id.* at 18.)

Overall, Fielding has not provided sufficient evidence demonstrating that a causal connection exists between the protected activity and his termination. In fact, the record reflects the opposite, as Fielding often engaged in protected activity after receiving corrective action. For that reason, even if Fielding had exhausted his administrative remedies for the retaliation claims, the claims would still fail as a matter of law.

### C.    Hostile Work Environment

Fielding also appears to allege that Allina created a hostile work environment. "To establish a prima facie hostile work environment claim, a plaintiff must prove: (1) that [he] was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and [his] membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007).

Fielding asserts two types of harassment that he experienced at Allina. First, he alleges that numerous complaints were made against him that were "pretextual and used for the purposes of further harassing" him. (Doc. No. 122 at 7.) Second, he asserts that

coworkers and patients made derogatory statements about him, and Allina failed to prevent or stop this harassment.

Fielding fails to establish a causal link between the complaints made against him by coworkers and patients and his membership in a protected group. As noted above, complaints were made against Fielding by a multitude of people, including nurses, other staff, and patients. Most of these complaints were corroborated by others. While Fielding may dispute the complaints, he has not demonstrated that any of the complaints were based on his race, color, or national origin.

Additionally, Fielding alleges that several nurses made derogatory comments about him, including using the n-word and referring to him as "you Blacks" and "boy." He also alleges that Scott and Haugen made discriminatory statements and specifically alleges if he ever went to Scott for anything, "it always ended with 'you Blacks.'" "To be actionable, such conduct must be shown to occur with such frequency that the very conditions of employment are altered and be viewed by a reasonable person as hostile." *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 893 (8th Cir. 2005). As noted above, Fielding had been unable to identify when these comments were made or how often. Fielding "has made only vague allegations of harassment" and "he cannot recall the dates of the incidents nor has he provided any evidence to corroborate these incidents." *Askari v. L.A. Fitness Intern., LLC*, No. 09-cv-2789, 2010 WL 3938320, at *5 (D. Minn. Oct. 5, 2010). Overall, Fielding has not demonstrated that the work environment at Allina was objectively hostile.

## V.      Section 1981 Claim

Fielding also asserts race discrimination under Section 1981.  The same analysis

applies to Section 1981 and Title VII race discrimination claims "when they are based on

identical facts and theories."  *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 964 (8th

Cir. 2023).  "Both Title VII and § 1981 claims [are analyzed] under the burden-shifting

framework in *McDonnell*."  *Id.*  Thus, for the reasons outline above, Fielding's Section

1981 claim fails.

## CONCLUSION

For the reasons outlined above, the Court grants Allina's motion for summary

judgment.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Allina's motion for summary judgment (Doc. No. [86]) is **GRANTED**.

2.      Fielding's claims against Allina are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date:  October 31, 2023                           s/Donovan W. Frank
                                                  DONOVAN W. FRANK
                                                  United States District Judge